**UNITED STATES of America**

v.

**Bobby R. LINDSEY, Appellant.**

**No. 71-1298.**

United States Court of Appeals, Third Circuit.

Argued Oct. 1, 1971.

Decided Nov. 18, 1971.

I have had the above statements of my rights read and explained to me and fully understanding these rights I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity. I was taken into custody at _____ (time), on _____ (date), and have signed this document at _____ (time), on _____ (date).

_____
(Name)

Witnesses:

_____
(Name)

_____
(Name)

Domenic D. Toto, Goldstein & Toto, Maplewood, N. J., for appellant.

Theodore Margolis, Asst. U. S. Atty., Newark, N. J. (Herbert J. Stern, U. S. Atty., Newark, N. J., on the brief), for appellee.

Before SEITZ, Chief Judge, HASTIE, Circuit Judge and HERMAN, District Judge.

## OPINION OF THE COURT

SEITZ, Chief Judge.

On this appeal from a conviction under the federal narcotics laws, 21 U.S.C. A. §§ 173, 174 (1961), the defendant contends the trial court erroneously admitted into evidence heroin allegedly seized in violation of the constitutional proscription against unreasonable searches and seizures.

On March 20, 1970, Marshal Brophy, an officer of the Anti-Highjacking Task Force, was monitoring passengers boarding Eastern Airlines Flight 427 bound for Atlanta, Georgia from Newark Airport. The Anti-Highjacking Task Force is an intergovernmental agency composed of Justice Department, Federal Aviation Administration and airline industry personnel who have been seeking solutions to the problem of airline highjacking. At approximately 11:55 p. m., about four minutes prior to the scheduled departure of Flight 427, Marshal Brophy observed defendant rush into the boarding lounge. Defendant handed a ticket to the ticket agent on duty and told him to "(s)ave a seat for Williams." It is not clear whether Marshal Brophy himself examined the ticket. However, the ticket agent noted it was in the name of "James Marshall," and made a gesture to Marshal Brophy, indicating defendant should be watched.

His suspicions aroused, the marshal continued to observe the defendant. Defendant appeared nervous and was "looking about" and "perspiring."

When the moment of departure arrived, and the defendant moved towards the aircraft, Marshal Brophy approached defendant, identified himself and asked for identification. Defendant handed Marshal Brophy a Selective Service card bearing the name "Melvin Giles." The general indicia of extreme anxiety Marshal Brophy noted before seemed to increase. By way of further identification defendant produced a Social Security card bearing his true name "Bobby R. Lindsey."

In the course of ascertaining defendant's identity, Marshal Brophy noted two large bulges in defendant's coat pocket. Fearing the bulges might be weapons, the Marshal asked defendant to come with him to an area adjacent to but outside of the boarding lounge. There he patted down defendant to effect a weapons search. After feeling the bulges in defendant's coat pocket, which he described as "very solid," Marshal Brophy extracted from the pocket two aluminum-wrapped packages later found to contain the heroin which was the main prosecution evidence at trial. There was, of course, no search warrant.

■ Defendant contends the heroin was inadmissible evidence because it was obtained by an unlawful search and seizure. The government says that the heroin was lawfully seized under the circumstances, relying on Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

In Terry, the Supreme Court reviewed a conviction for carrying concealed weapons. The evidence against the petitioner had been obtained as the result of a search conducted on a public street by a plainclothes detective acting without a warrant. The suspicions of the detective had been aroused by observation of several men who appeared to be lingering an unusual length of time in front of a store window. The detective, although without having probable cause to arrest the subject of the search, stopped the petitioner and two others, asking their names. After they "mumbled" a response, the detective conducted a patdown or weapons search which turned up the weapon admitted against petitioner at trial. The Court, in upholding the validity of the search in Terry said, at 30, 88 S.Ct. at 1884:

"* * * where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him."

The court ruled that the detective formed a reasonable belief that criminal activity might have been afoot and that nothing in his reasonable preliminary inquiries dispelled his reasonable fear that the men he questioned might be armed.

Applying Terry to the case at hand, we believe Marshal Brophy's reactions to the unusual behavior of the defendant were justified. In the context of a possible airplane highjacking with the enormous consequences which may flow therefrom, and in view of the limited time in which Marshal Brophy had to act, the level of suspicion required for a Terry investigative stop and protective search should be lowered. Therefore, despite the fact that it may be said that the level of suspicion present in the instant case is lower than in Terry, it was sufficiently high to justify Marshal Brophy's acting.

In United States v. Marshall, 440 F.2d 195 (D.C.Cir.1970), cert. denied 400 U.S. 909, 91 S.Ct. 153, 27 L.Ed.2d 148 (1970), a man was observed in Washington, D.C. about midnight driving a rented Virginia car. The police followed him a short distance and observed him making many turns. The driver of the car then pulled it over to the side of the road, parked it haphazardly with the lights left on and started running from it. The police stopped him and he produced a driver's permit and rental contract for the car. Noticing a bulge in his clothing, the police searched him and discovered a concealed gun. The court upheld this search on the basis of *Terry*. The level of suspicion present in *Marshall* was lower than in *Terry*, but the court found the investigative stop and the protective search justified. See also Ballou v. Commonwealth of Massachusetts, 403 F.2d 982 (1st Cir. 1968), cert. denied 394 U.S. 909, 89 S.Ct. 1024, 22 L.Ed.2d 222 (1969).

Two other cases decided under *Terry* demonstrate the principle that even though the level of suspicion is sufficiently high a *Terry* protective search must be limited in scope to discovery of weapons. In United States v. Davis, 441 F.2d 28 (9th Cir. 1971), the defendant was stopped after the police witnessed him commit three serious traffic offenses. They patted down defendant and felt a bulge in his pants pocket. They proceeded to extract a roll of counterfeit bills. The court ruled the search invalid under *Terry*, concluding that the officers had no reason to believe the suspect was armed or dangerous. In Tinney v. Wilson, 408 F.2d 912 (9th Cir. 1969), the pat down revealed something in defendant's pocket that felt like pills wrapped in cellophane. The officer effected a search and the material turned out to be drugs illegally possessed. The officer testified that he did not believe defendant was armed. The court overturned the search on the ground that it was not limited to discovery of weapons.

Both *Tinney* and *Davis* are distinguishable from the instant case since here Marshal Brophy, believing defendant might be a highjacker, was justified in thinking he was armed and dangerous. It was therefore reasonable for him to extract the bulging objects from defendant's pockets since, unlike the pills in *Tinney*, the objects were sufficiently large to reasonably suggest that they might be weapons.

We think that under all the circumstances Marshal Brophy satisfied the commands of the Fourth Amendment as interpreted in *Terry*. Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1912, 20 L.Ed.2d 917 (1968). The use of four different names, defendant's extremely anxious behavior and the very hard bulge in the coat pocket provided a sufficient basis, in the context of an airline boarding, to stop defendant and conduct a limited pat down.

There was testimony at the hearing on the motion to suppress the evidence that the Marshal and possibly the ticket agent used a so-called Behavior Pattern Profile to determine whether defendant fit the mold of prior highjackers. Substantial issues concerning such usage are posed. However, we need not reach them because the justifiable bases for the search were largely independent of the Profile.

■ Appellant also claims that the trial court's charge to the jury was erroneous. The elements of an offense under section 174, *supra*, are willful concealment or transportation of an illegally imported narcotic drug which defendant knows to have been illegally imported. However section 174 further provides:

"Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

Therefore, although section 174 makes knowledge of illegal importation a substantive element of the offense, the last-

quoted provision virtually eliminates the need to prove this element directly. Of course a defendant has the right to challenge the possession inference by showing that the heroin was not imported. In Turner v. United States, 396 U. S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), the scheme of section 174 was upheld with respect to heroin and rejected with respect to cocaine.

When charging the jury originally the trial court failed to include any reference to the presumption provision of section 174. The reason is unclear. The government did not request a charge based on this presumption. Without this instruction the jury, of necessity, was left to struggle with the question whether the government had proved beyond a reasonable doubt that defendant knew the heroin he possessed was illegally imported. Apparently the jurors were facing this kind of difficulty for they returned a question to the judge after the first charge:

> "The jury does not fully understand the part of the indictment which states 'knowing that the said narcotic drug had theretofore been imported and brought into the United States contrary to law.' "

At this point the *Turner* case was brought to the attention of the court. On reading that case, the court concluded it should charge the jury that unexplained possession sufficed for conviction as section 174 provides.

The jury was still having difficulties after this charge. They again returned to inform the court that no unanimous verdict could be agreed upon. The court instructed the jury to return for further deliberations. In doing so, the judge reiterated several points from his previous charge, including the knowledge element of section 174. The judge did not, however, repeat the point that, under the statute, unexplained possession sufficed to convict.

After these events the jury propounded the following question to the court:

> "In our consideration of this case can a jury disregard the following phrase in its entirety 'knowing that said narcotic drug had theretofore been imported and brought into the United States contrary to law'? If this phrase cannot be disregarded in its entirety, is it less important than the fact that the defendant may have had heroin in his possession, and 'did knowingly, willfully, and unlawfully receive, conceal and facilitate the transportation and concealment of a narcotic drug'?"

The trial judge felt at this point that the jury had not grasped the relationship between the knowledge elements of section 174 and the provision for presuming knowledge from unexplained possession. He therefore read the substantive portion of section 174 and the unexplained possession provision and told the jurors:

> "Ladies and gentlemen, it is not possible to give you a categorical answer to these questions. I can answer them but I can't answer the questions this way."

Defense counsel objected to the court's handling of the question. He requested the court to charge that the jury could not ignore or give less weight to the knowledge elements of section 174.

The jury's question showed an understandable difficulty in grasping the effect of section 174. A reading of the section by the district court constituted a reasonable attempt to clear up the confusion. A categorical negative answer to the question, although it would technically have been correct, probably would not have cleared up the jury's confusion. We therefore conclude that the court's handling of this situation did not constitute error.

The judgment of the district court will be affirmed.