**UNITED STATES of America**

**v.**

**Aaron REID et al., Defendants.**

**No. 72-CR-713.**

United States District Court,
E. D. New York.

Nov. 28, 1972.

Robert A. Morse, U. S. Atty., E. D. of New York, for the United States; David Ritchie, Asst. U. S. Atty., of counsel.

Andrew E. Kuchinsky, New York City, for defendant, Tibor Loffler.

## MEMORANDUM OF DECISION AND ORDER

MISHLER, Chief Judge.

Defendant Loffler moves pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure to suppress for the use as evidence a packet of counterfeit

bills seized by a secret service agent from the left inside pocket of his jacket on March 8, 1972 at 555 Nostrand Avenue, Brooklyn, New York. The court held an evidentiary hearing.

555 Nostrand Avenue, Brooklyn, New York, is a clothing store in an area inhabited almost exclusively by Blacks. Defendant rents a portion of that store for the conduct of a retail business selling shoes and other merchandise. On March 7, 1972, Angus Sloan, Jr., known as "Stitch," a confidential informant (whose identity was revealed at the hearing), introduced Special Agent Willie Potts to co-defendant Aaron Reid who was engaged in the business of selling counterfeit money.[1] Special Agent Potts completed the transaction and received counterfeit Federal Reserve Notes from Reid. The transaction was negotiated and completed in a back room, separated by a door from the store in which Loffler conducted his business. The next day Special Agent Potts entered the premises alone and again in the back room offered to buy counterfeit money in the face amount of $40,000 from Reid. Loffler was in the store portion of the premises selling shoes to customers. Reid left the back room and Potts noticed that he spoke to a few people in the store among whom was defendant Loffler. Reid returned to the back room and advised Potts that the sale would have to be made as two transactions of $20,000 each instead of one of $40,000.

On exiting the store Potts (who is Black) spoke to another agent (who is also Black) who then gave a pre-arranged signal. Agents entered the premises with drawn revolvers and shotguns,[2] and announced that they were federal officers and that everyone in the store was under arrest. At that time Loffler was waiting on one customer, Luther Graham,[3] and wrapping up a pair of shoes sold to another. All those present in the store (five persons including Reid) were ordered against the wall facing the wall, hands above their heads and legs in spread eagle position. After the occupants were thus positioned, Special Agent Anthony F. Colgary III of the Secret Service of the Treasury Department entered the premises and proceeded to pat down Loffler and the others while they were held at bay by the other agents. Loffler had been ordered to move away from the wrapping counter and to face the wall. While patting down Loffler, Colgary felt a bulge in his left breast pocket that could possibly have been a slapjack.[4] Special Agent Colgary was not aware of Loffler's identity until he seized the packet of counterfeit bills from the left inner pocket of Loffler's jacket.

The government concedes that probable cause to believe that Loffler committed or was committing a crime was lacking. The government claims that the officer's right to pat down in a search for weapons was based on evidence that Reid was engaged in the counterfeiting business and a person known as Sam who worked in the store was in conspiracy with Reid.[5] The belief that Loffler

---

1. Sloan, whose reliability had not been established (and who is under indictment on counterfeit charges), had two previous transactions with Reid involving counterfeit money. He told the agents that Loffler never participated in the transactions nor was he present when the counterfeit money was passed (Tr. p. 54). He opined that Loffler had something to do with it.

2. The agents were justifiably in danger of harm from the inhabitants of the area since all the agents (except Potts) were White. Experience has shown that resentment of Blacks against arresting White police officers runs high and at

times breaks out into mob violence. See United States v. Edmons, 432 F.2d 577 (2d Cir. 1970).

3. Luther Graham was released when the search of his person failed to reveal evidence of criminal activity.

4. A slapjack consists of two pieces of leather containing a piece of lead.

5. The informant (Sloan) whose reliability had not been established told Special Agent Colgary that " . . . . it appeared that [Sam, later identified as Loffler] had some sort of partnership or dealing in [counterfeiting]." (Tr. p. 41).

could have been armed was premised on the experience of police officers that suspects dealing in large quantities of counterfeit money are often armed.[6]

The government relies on Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968).[7] Terry held that under exigent circumstances upon reasonable suspicion that a crime is being committed or about to be committed, a police officer may stop a perpetrator or potential perpetrator for a brief period for the limited purpose of ascertaining identification and a pat down for weapons prior to arrest without offending Fourth Amendment rights.

*Terry* was an on-the-street encounter. It was the first case in which the Court was called upon to decide under what circumstances the Fourth Amendment allows a police officer pursuing his investigative duties in the interest of effective law enforcement to invade a citizen's personal security. *Terry* made it clear that Fourth Amendment limitations come into play as effectively in a stop (or seizure of persons) as in a "technical arrest," as surely in a "pat down" as in a "full blown search." 392 U.S. at 19, 88 S.Ct. at 1878–1879. The Court recognized that refinement of the general principles enunciated in this area of constitutional law would be developed ". . . in the concrete factual circumstances of individual cases." 392 U.S. at 29, 88 S.Ct. at 1884.[8]

*Terry* held that a police officer may stop a person briefly for questioning upon reasonable suspicion that that person is engaging or about to engage in criminal activity, and that upon suspicion that the person may be armed, the police officer has the right to frisk him. 392 U.S. at 23–24, 88 S.Ct. at 1881. The right to intrude on the citizen's personal security is based on ". . . more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." 392 U.S. at 23, 88 S.Ct. at 1881.

Sibron v. New York and Peters v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)[9] decided the same day as *Terry*, described a *Terry* type search as consisting "solely of a limited patting of the outer clothing of the suspect for concealed objects which might

---

6. This is to protect the counterfeiters' investment and/or rob the purchaser.

7. In *Terry*, Cleveland Police Detective Mc-Fadden, a policeman for 39 years and a detective for 35 assigned to patrol downtown Cleveland for shoplifters and pickpockets for 30 years observed defendant and one Chilton confer, then separate— one looking into a store window—and then rejoin about a dozen times over a period of 10 to 12 minutes. At one point a third man joined them. He suspected them of "casing" the store for a burglary. He feared they had a gun. Detective Mc-Fadden approached them, identified himself, and asked their names. They mumbled something unintelligible in response. He spun Terry around and patted down the outside of his clothing and felt a pistol. He found it difficult to remove the pistol and ordered all three inside a nearby store. There Detective McFadden removed Terry's coat and removed a loaded .38 caliber revolver from the pocket.

8. Mr. Justice Harlan in his concurring opinion stated that his purpose in writing was "to fill in a few gaps" in this important new field of law. 392 U.S. at 31, 88 S.Ct. at 1885.

9. In *Sibron* a police officer while patrolling his beat noticed defendant between 4:00 P.M. and 12:00 midnight at a particular location in Brooklyn in conversation with 6 or 8 persons who were known addicts. The Court found defendant's rights were violated. The Court said: "In this case, with no attempt at an initial limited exploration for arms, Patrolman Martin thrust his hand into Sibron's pocket and took from him envelopes of heroin." 392 U.S. at 65, 88 S.Ct. at 1904.

In *Peters* the majority found there was probable cause for arrest and sustained the search as incident to the lawful arrest.

be used as instruments of assault." 392 U.S. at 65, 88 S.Ct. at 1904.

The latest pronouncement [10] by the Court on stop and frisk came on June 12, 1972 in Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).[11] The Court held that the police officer had enough information ". . . to justify the officer's forcible stop of Williams." 407 U.S. at 147, 92 S.Ct. at 1924. Explicating *Terry* the Court explained the purpose of the stop and the frisk as follows:

"A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. [Citations omitted]

. . . The purpose of [an ensuing] limited [protective] search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable whether or not carrying a concealed weapon violated any applicable state law. So long as the officer is entitled to make a forcible stop and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." 407 U.S. at 146, 92 S.Ct. at 1923.

No case has come to the court's attention which approves of a frisk of an individual without a stop directed towards *investigating* that individual.[12] Implicit in *Sibron* is the denial of such a right to

10. The government also cites United States v. Bell, 464 F.2d 667 (2d Cir. 1972). In *Bell*, defendant entered LaGuardia Airport to purchase a ticket for a flight to Atlanta, Georgia. The ticket seller, employed by the airline eight years, was familiar with the anti-hijacking system developed to identify potential skyjackers. He was designated as a "selectee" by the ticket seller. The ramp agent at the boarding point was so notified. When Bell went through the magnetometer, it was activated, indicating the presence of metal on Bell. When he was asked for identification, Bell advised the United States Marshal that he had just been released from the Tombs and that he was out on bail for attempted murder and narcotics charges. The Marshal patted down the outside of his overcoat and felt a hard object about 4 or 5 inches long. At the request of the Marshal, the defendant took the object out of his pocket. It was a brown paper bag in which were glassine envelopes containing heroin.

The court found that the police officer had a reasonable belief that some criminal activity might take place and a reasonable belief that the suspect may have had a weapon. The brief stop for investigative purposes and the manner of the frisk were approved under *Terry*. Cases involving suspects boarding a plane are more likely to allow a search than under other circumstances because of the danger of hijacking of airplanes and the expert personnel and sophisticated equipment present at airports to detect unusual behavior and presence of weapons and other destructive devices. The Court said in *Terry*:

"[P]olice are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess." 392 U.S. at 10, 88 S.Ct. at 1874.

See United States v. Lindsey, 451 F.2d 701 (3 Cir. 1971); United States v. Riggs, 347 F.Supp. 1098 (E.D.N.Y.1972). The *Lindsey* court indicated that in airport stops ". . . the level of suspicion required for a *Terry* investigative stop and protective search should be lowered." 451 F.2d at 703.

11. In *Adams*, Police Sgt. Connolly was alone at 2:00 A.M. in his patrol car in a high crime area of Bridgeport. A person known to Connolly approached and informed him that a man seated in a nearby vehicle was in possession of narcotics and had a gun concealed at his waist. He approached the car and ordered the occupant to open the door. Instead the occupant rolled down the window. Connolly reached into the car and removed a fully loaded revolver from the waistband. The gun was not visible to Connolly from where he was standing.

12. The original arrest (or stop) of Loffler was not investigative but solely for the protective purpose of effectuating Reid's arrest.

the police officer. Mr. Justice Harlan so interpreted *Terry*. In his concurring opinion he said:

> "In the first place, if the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a *forcible* stop. . . . I would make it perfectly clear that the right to frisk in this case depends upon the reasonableness of a forcible stop to investigate a suspected crime." 392 U.S. at 32–33, 88 S.Ct. at 1885–1886.

The analogy of the right to search for weapons as incident to a lawful arrest is not amiss. See *Sibron, supra,* 392 U.S. at 67, 88 S.Ct. at 1905.

■ The manner of the arrest also brings the search under constitutional scrutiny. The Constitution will not tolerate the indiscriminate arrest of a group of citizens because of suspicion that one of the group committed a crime. In such case, police efficiency must submit to the constitutional limitation that preserves the Fourth Amendment right to personal security. The Court said in Davis v. Mississippi, 394 U.S. 721, 726–727, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969):

> "Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.' "

■■ The search in the case before this court went beyond the permissible limits set out in *Terry*. Special Agent Colgary had no reasonable belief that the object he felt within Loffler's inside pocket was an assaultive weapon. The search is strictly limited in scope to a search for assaultive weapons. *See Terry,* 392 U.S. at 27, 88 S.Ct. at 1883. If the pat-down reveals objects that cannot reasonably be believed to fall into that category, the officer has no right to remove them.[13] *See* Tinney v. Wilson, 408 F.2d 912, 916 (9th Cir. 1969). With the weaponry in the hands of the agents trained on the suspects, a slapjack could hardly have been a threat to the arresting agents. Furthermore, a slapjack is of various sizes but usually narrower than currency, and thus Special Agent Colgary's belief that the object could possibly have been a slapjack was not a reasonable belief that the object was a slapjack. The manner of the search in a stop and frisk should be closely scrutinized. The opportunity for abuse of the police officer's right is a threat to the citizen's Fourth Amendment right. "There is too much danger that, instead of the stop being the object and the protective frisk an incident thereto, the reverse will be true." Williams v. Adams, 436 F.2d 30, 38 (2d Cir. 1970) (Friendly, Ch. J., in dissent).[14]

The motion to suppress is granted. It is

Ordered that the packet of counterfeit bills seized from the person of the defendant Tibor Loffler on March 8, 1972 be and the same is hereby suppressed for the use as evidence.

This memorandum of decision and order is filed nunc pro tunc as of November 21, 1972.

---

13. Again, like every test of reasonableness, it depends on all the attendant circumstances. In patting down a suspect at an airport about to board a plane, a soft packet of bills might reasonably be believed to be a high explosive and thus be subject to seizure.

14. Rev'd en banc, 441 F.2d 394 (2d Cir. 1971). The Second Circuit's en banc opinion was in turn reversed by the Supreme Court in *Adams, supra.*