**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Abraham Pina MORENO, Defendant-
Appellant.**

**No. 72–2484.**

United States Court of Appeals,
Fifth Circuit.

March 12, 1973.

Rehearing Denied April 10, 1973.

William S. Sessions, U. S. Atty., Reese L. Harrison, Jr., Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before GEWIN, BELL and GODBOLD, Circuit Judges.

GEWIN, Circuit Judge:

In this appeal we are asked to decide the constitutional propriety of an airport search and seizure, the fruits of which resulted in Abraham Pina Moreno's arrest and non-jury conviction under 21 U.S.C. § 841(a)(1) [1] for the unlawful possession of 86.6 grams of heroin with an intent to distribute. Important questions of public policy are involved in this case. Resolution of the primary issue presented requires this court to perform the difficult and sensitive task of balancing the individual rights protected by the fourth amendment against the overwhelming public interest in effective protection from the threat posed by air piracy, a crime that has terrorized and threatened the lives of many people in recent years. The danger and the harm continue to be of national concern. For reasons which will be fully developed in subsequent discussion, we find that the search and seizure in this case did not offend the fourth amendment. Accordingly, we affirm the judgment of the district court.

I

On January 21, 1972 Moreno arrived in San Antonio International airport aboard a Braniff Airlines flight from which he was observed deplaning by Deputy U. S. Marshal Granados, a member of the airport's Anti-Air Piracy detail, who had 20 years experience as a law enforcement officer. When Moreno came into the lounge area, Granados noticed that he appeared to be looking for someone and was unusually wary of the airport security guards. He was visibly nervous as he proceeded into the main

Stanley D. Rosenberg, San Antonio, Tex. (Court-Appointed), for defendant-appellant.

1. 21 U.S.C. § 841(a)(1) provides as follows:
"(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or . . . ."

terminal area and Granados saw that this condition became more pronounced when he realized that he was under surveillance. Shortly thereafter he entered a taxicab and left the airport.

About two hours later, Moreno returned and once again Granados began observing him. He went first to the Braniff ticket counter and got in line. Obviously very nervous, he switched from one line to another, several times before going to the Southwest Airlines counter where he finally bought a ticket. After purchasing the ticket he headed toward the gate of Southwest Airlines, looked straight at Officer Granados who was walking towards him, and he then went into a restroom located nearby. Granados noticed that he seemed to be protecting or covering something, and inside the restroom where he was able to get a closer look, he saw that there was a prominent bulge on the left side of Moreno's coat. This aroused his suspicion that Moreno might be carrying some kind of weapon or explosive device that could be used in an air piracy attempt.

Thereupon Granados approached Moreno, identified himself and inquired whether anything was wrong. Moreno said he was a little nervous, adding that he had just arrived in San Antonio the day before and taken a taxicab to the Baptist Memorial Hospital downtown. He was unhappy with the taxicab fare that he was charged for the trip back to the airport. This account aroused Granados' suspicion still further because he knew that Moreno had arrived in San Antonio only a few hours earlier and that he had gone to a bus station upon leaving the airport and not to the hospital as he claimed. After being asked twice to produce some identification, Moreno did so only after substantial hesitation. Finally, he removed a wallet from the inside left pocket of his coat and gave it to Granados who by then was concerned that he might attempt to escape. Officer Granados stated that after he received the identification papers, Moreno "started to turn" and that

he thought Moreno was going to attempt to "run out of the restroom" because there were several doors "leading outside from that restroom." At this point Grenados signaled another officer "to come give me a hand with him." Officer Chapa then joined Granados and they escorted Moreno to the security office.

At that point, Moreno was informed that he could make any complaints that he might have at the airport security office. At the preliminary hearing in this case, the evidence showed that Granados ordered Moreno to go to the security office and would have used any force necessary to prevent him from running away. As soon as they reached the security office a pat down search was conducted after which Moreno was asked what he had in his inside coat pocket. He pulled out some papers which obviously were not the cause of the bulge. He was then ordered to take his coat off and the ensuing search yielded three cellophane wrapped packages which contained the heroin involved in this case.

Prior to trial, Moreno filed a motion to suppress as to the heroin seized in the airport search. He contended that even if there were sufficient circumstances to justify a stop and frisk, the detention and subsequent search went far beyond the constitutionally permissible intrusion contemplated by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In denying the motion, the district court recognized "the strong need for reasonable searches and seizures in furtherance of the public interest against air piracy." Accordingly, it concluded that the arresting agents were reasonably justified in believing that Moreno might be armed and dangerous and in stopping and searching him pursuant to that belief.

## II

After careful analysis, it is our considered judgment that the disposition of this case is controlled by the rationale and teachings of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 884 (1968)

and subsequent decisions of circuit courts construing *Terry* in the context of an airport search. United States v. Slocum, 464 F.2d 1180 (3d Cir. 1972); United States v. Bell, 464 F.2d 667 (2d Cir. 1972); United States v. Epperson, 454 F.2d 769 (4th Cir. 1972); United States v. Lindsey, 451 F.2d 701 (3d Cir. 1971). While we are fully aware of the sheer urgency of the current air piracy problem, we do not believe that fact alone is sufficient justification for a warrantless airport search.

In our resolution of this issue it is important to review and analyze the considerations which lay at the heart of the *Terry* decision. In balancing the fourth amendment interests at stake against the practical requirements of effective law enforcement, the Supreme Court measured the constitutionality of the police officer's conduct by the following standard: whether the facts available to the officer at the moment of the seizure or the search would justify a man of reasonable caution in the belief that the action taken was appropriate. 392 U.S. 1, at 22, 88 S.Ct. 1880, 20 L.Ed.2d 889, at 906. Even though a serious intrusion upon the sanctity of the person was involved, the Court gave its approval to a limited weapons search of a suspect who was under investigation for possible criminal activity. It did so despite the fact that at the time the police officer had no probable cause to make an arrest. In reaching this conclusion, the court emphasized that the intrusion entailed by this search had been strictly confined to what was minimally necessary not only to insure the personal safety of the investigating officer, but also the safety of others. Indeed the safety of others is repeatedly mentioned throughout the opinion. In short, the scope of the search was consistent with the valid purpose for whch it was initiated.

Although the personal safety of the police officer is a valid governmental interest at stake in deciding the proper scope of a warrantless airport security search, that is not the only governmental interest involved. Of equal importance to airport security searches is the central purpose of thwarting air piracy which often involves the safety of passengers and crew on tremendous aircraft after the plane is airborne with a heavy cargo. At this point in time the security officer is usually safe in the airport. However, the "others" involved, the passengers and the crew, are in the air.[2]

---

2. The decision in *Terry* does not constitute an erosion or dilution of fourth amendment prohibitions against unreasonable searches and seizures. The opinion emphasizes the sacred right of fourth amendment principles which are designed to assure full expectations of privacy.

Chief Justice Warren flatly rejected the suggestion that by the use of the terms "stop" and "frisk" the conduct of police in making a search and seizure is outside the fourth amendment because neither action rises to the level of a "search" or "seizure" within the meaning of the Constitution. We quote his emphatic language:

"We emphatically reject this notion. It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime —'arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person. And it is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a 'search.' Moreover, it is simply fantastic to urge that such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a 'petty indignity.' It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." 392 U.S. at 16–17, 88 S.Ct. at 1877, 20 L.Ed.2d 903.

The decision gives full consideration to fourth amendment concepts in dealing with the problem presented. In resolving the issues, the Court gave careful consideration to the following factors:

1. The governmental interest which allegedly justifies official intrusion upon the

## III

■ Although the problem of aerial hijacking is well known to the public, we think it appropriate, nevertheless, to single out our reasons for treating airport security searches as an exceptional and exigent situation under the Fourth Amendment. At the core of this problem is the hijacker himself. In some cases he is a deeply disturbed and highly unpredictable individual—a paranoid, suicidal schizophrenic with extreme tendencies towards violence.[3] Although the crime of air piracy exceeds all others in terms of the potential for great and immediate harm to others, its undesirable consequences are not limited to that fact. Among other things, it has been used as an avenue of escape for criminals, a means of extorting huge sums of money[4] and as a device for carrying out numerous acts of political violence and terrorism.[5] Perhaps most disturbing of all is the fact that aerial hijacking appears to be escalating in frequency. We do not think that it is unrealistic to say

constitutionally protected rights of the private citizen. 392 U.S. 21, 22, 88 S.Ct. 1879, 1880, 20 L.Ed.2d 905, 906.

2. The reasonableness of the police conduct involved after careful consideration of all the circumstances surrounding the particular governmental invasion of a citizen's personal security. 392 U.S. 23, 88 S.Ct. 1881, 20 L.Ed.2d 907.

3. Whether the facts available to the officer at the moment of the seizure or the search, "warrant a man of reasonable caution in the belief" that the action taken was appropriate. 392 U.S. 22, 88 S.Ct. 1880, 20 L.Ed.2d 906.

4. A valid governmental interest is the effective detection and prevention of crime and pursuant to that purpose a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest. 392 U.S. 22, 88 S.Ct. 1880, 20 L.Ed.2d 906–907.

5. An experienced police officer is charged with the duty to investigate suspicious behavior under certain conditions in order to prevent or detect criminal activity. 392 U.S. 23, 88 S.Ct. 1881, 20 L.Ed.2d 907.

6. In situations in which an officer justifiably suspects criminal activity a search and seizure is authorized, in the absence of probable cause, in order to protect the officer and other prospective victims of violence. 392 U.S. 24, 88 S.Ct. 1881, 20 L.Ed.2d 907–908.

7. If the facts justify an officer's belief that he is dealing with an armed or dangerous individual he is authorized to conduct a limited search of that individual in the absence of probable cause even though he is not absolutely certain that the individual is armed; "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." 392 U.S. 27, 88 S.Ct. 1883, 20 L.Ed.2d 909.

8. There is no hard and fast rule which will provide a ready solution of problems arising from search and seizure on every occasion, but each case must be decided on its own facts. 392 U.S. 30, 88 S.Ct. 1884, 20 L.Ed.2d 911.

3. For an exhaustive study of the psychological makeup of the air pirate see, D. Hubbard, *The Skyjacker: His Flights of Fantasy* (1971). Equally vivid in presenting the same picture is an article which appeared in *The National Observer*, Nov. 11, 1972, at 6. It tells the startling tale of a Washington bureaucrat, Charles Tuller, whose smouldering resentment and frustration led him to commit air piracy. In his wake, he left a Houston ticket agent dead. The frightening part of this account is that Charles Tuller was an unobtrusive, ordinary man—in appearance at least no different from any other air traveler of today.

4. There have been 387 air piracy attempts since the initial one in 1930; of those, about two dozen, all of them recent, have been for extortion purposes. *Time*, Nov. 27, 1972, at 22. According to one very recent article, $12.7 million in extortion demands have been made against U.S. airlines, only about half of which has been recovered. *Aviation Week & Space Technology*, Nov. 20, 1972, at 14.

5. A recent example was the successful takeover by Palestinean terrorists of a German airliner carrying 11 passengers. With the passengers as hostages, they forced German authorities to release three of their imprisoned comrades who were participants in the slaying of members of the Israeli Olympic team in Munich this past summer. *Time*, Nov. 13, 1972, at 29.

that the current situation has approached the crisis stage for law enforcement officials in this country.

Apart from the unusual dangers inherent in the crime itself, aerial hijacking has created equally unusual detection problems. Unlike most other crimes, hijacking is one in which secrecy is not a principal concern. Once the hijacker decides to act, he doesn't care if there are numerous witnesses. Indeed, according to the pattern developed thus far, he prefers as many as possible because each one is a potential hostage to shield him from apprehension until he can be flown to a political sanctuary or place of concealment. Obviously, in order to jeopardize the lives and safety of the smallest number of people, the hijacker must be discovered when he is least dangerous to others and when he least expects confrontation with the police. In practical terms, this means while he is still on the ground and before he has taken any overt action.

Clearly, this would not be an easy objective to accomplish under the best of conditions. But amidst the rush and the congestion of many airports, this task is vastly complicated. Airport security officials have the awesome responsibility of ferreting out hijacking threats from among thousands of passengers while at the same time avoiding any undue disruption to this nation's heavy flow of commercial air traffic. Inseparably related to this is the fact that the hijacker's modus operandi is designed to take optimum advantage of these pressures. The hijacker prefers the anonymity of the crowd where he is but a part of the blend. The hiding place of his weapons is the commonplace accessory of air travelers everywhere— the overnight bag, the briefcase, the overcoat or other clothing. His arsenal is not confined to the cumbersome gun or knife; for modern technology has made it possible to miniaturize to such a degree that enough plastic explosives to blow up an airplane can be concealed in a toothpaste tube. A detonator planted in a fountain pen is all that is required to set it off. Unfortunately, society's law enforcement capabilities have not caught up with these problems.[6] It is in this context that we must assess the constitutionality of the search of Moreno.

## IV

Under the fourth amendment, whenever it is practicable an impartial magistrate should make the initial determination whether probable cause exists to justify an intrusion upon the sanctity of the person or the home. The Supreme Court, however, has long recognized that under certain circumstances adherence to the warrant requirement is not vital to the protection of the values implicit in the fourth amendment. *See, e. g.,* Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) (automobile search); Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L. Ed.2d 782 (1967) (hot pursuit); Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (search incident to arrest). In cases such as this one, where a warrantless search is conducted, it is necessary to strike a cautious balance between the competing in-

---

6. The airline industry's response thus far has been to implement a number of sophisticated measures to enable airport security officials to cope with the air piracy threat. These measures include the use of hijacker behavioral profiles, a metal sensitive device known as a magnetometer and, on an experimental basis recently, portable x-ray machines. Law enforcement officers with experience over long years of service have proved to be highly valuable in this effort. In addition, the Federal Aviation Administration has recently required airlines to conduct systematic searches of all carry-on baggage for all flights. See *Aviation Week & Space Technology*, August 21, 1972 at 28; *Id.* Sept. 4, 1972 at 28. In spite of the deterrent potential in these measures, they are not used by all airlines in all airports domestic and international. Hence, a kind of security gap still plagues the many earnest, but uncoordinated, attempts to bring air piracy under control.

terests of law enforcement and the right of the individual to be left alone. In doing this, we must be mindful of the fact that the constitution does not forbid all searches and seizures, only unreasonable ones. Elkin v. United States, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L. Ed.2d 1669, 1680 (1960). Thus, reasonableness is the ultimate standard by which we must be guided in determining the constitutional propriety of the airport search which resulted in Moreno's arrest and conviction for heroin possession. Camara v. Municipal Court, 387 U.S. 523, 539, 87 S.Ct. 1727, 1736, 18 L. Ed.2d 930, 941 (1966). See also United States v. Slocum, 464 F.2d 1180, 1182 (3d Cir. 1972).

In the case at hand, Officer Granados maintained constant surveillance on Moreno while he was in the airport area. One of the first things he observed was his unusual nervousness, a condition that seemed to intensify after Moreno realized that he was being watched. On the basis of information obtained from the taxicab dispatcher, Granados learned that when Moreno left the airport he had been taken to a downtown bus station in San Antonio. Upon his return about two hours later, Moreno seemed as anxious as before, changing waiting lines several times at one ticket counter before going to another airline to make his purchase. When Moreno walked into the restroom after starting toward the airline gate, Granados, a member of the airport's anti-air piracy detail, observed a prominent bulge on the left side of his coat about which he seemed unusually apprehensive. It was at this point that the decision was made to approach Moreno to investigate his behavior.[7] With respect to the validity of the officer's initial action in making the stop, we think that the principles reflected in the Supreme Court's "stop and frisk" decisions are relevant. As was observed in Adams v. Williams, 407 U.S. 143, 92 S. Ct. 1921, 32 L.Ed.2d 612, 616, 617 (1972):

" '[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for the purpose of investigating possible criminal behavior even though there is no probable cause to make an arrest.' 392 U.S., at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary Terry recognizes that it may be the essence of good police work to adopt an intermediate response. See id., at 23, 88 S.Ct. at 1881, 20 L.Ed.2d at 907. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."

■ Under the circumstances known to Granados, and particularly in light of his special responsibility for the prevention of air piracy, we think that he acted reasonably. Moreno's nervousness, coupled with the bulge in his coat pocket and the fact that he had just purchased an airline ticket and headed in the direction of the airline gate are circumstances which supported Granados' belief that this man might pose an air piracy threat. His investigatory action was neither arbitrary nor impulsive. It

7. In Terry v. Ohio, 392 U.S. 1, 5, 88 S.Ct. 1871, 20 L.Ed.2d 889, 896 the circumstances observed by the officer were described as follows:
   "He explained that he had developed routine habits of observation over the years and that he would 'stand and watch people or walk and watch people at many intervals of the day.' He added: 'Now, in this case when I looked over they didn't look right to me at the time.'
   His interest aroused, Officer McFadden took up a post of observation in the entrance to a store 300 to 400 feet away from the two men. 'I get more purpose to watch them when I seen their movements,' he testified."

came only after cautious surveillance which revealed devious and suspicious conduct. We think it was entirely consistent with the officer's lawful duties. Tragic experience has taught us more than once that such deterrence must begin before the hijacker is about to step onto the plane.

■ Due to the gravity of the air piracy problem, we think that the airport, like the border crossing,[8] is a critical zone in which special fourth amendment considerations apply. It is the one channel through which all hijackers must pass before being in a position to commit their crime. It is also the one point where airport security officials can marshal their resources to thwart such acts before the lives of an airplane's passengers and crew are endangered. In applying *Terry* were we to hold that airport security officials must always confine themselves to a "pat down" search where there is a proper basis for an air piracy investigation, we think that such a per se restriction in the final analysis would be self-defeating. We have already pointed out that the hijacker can conceal explosives or weapons in places which might be overlooked in the course of a cursory pat down. It should be emphasized that such a search is not primarily for the investigating officer's protection, but rather for the protection of a distinct and uniquely threatened class—this nation's air carriers, their crews and passengers.

■ Relating these principles to the case at hand, we find that the invasion of Moreno's personal sanctity entailed by his detention and search did not offend the fourth amendment. Once confronted by the police, he appeared evasive and hesitant and lied about his destination when he was taken by taxi into downtown San Antonio. These responses reinforced Granados' original belief that Moreno should be investigated. We are not alarmed by the fact that Moreno was taken from the restroom to the airport security office before being searched. The permissibility of that intrusion cannot be gauged strictly on a temporal and spatial basis. Such a mechanistic approach is not the essence of the reasonableness determination. In view of the midafternoon congestion of the airport, we think the procedure followed by Granados and his fellow officer fell within proper bounds. A brief isolation of Moreno for the purpose of the search served to neutralize any threat that he might pose to others if he, in fact, was armed and dangerous. It should not be dismissed lightly that most hijackers are seriously disturbed, desperate people to whom the possibility of death is not always a deterrent. Furthermore, we believe that in virtually all cases the individual searched would prefer the privacy of the security office to the public place even though it involves a temporary surrender of personal liberty. If anything, the minor, but constitutionally acceptable indignity incident to an airport search conducted in that manner is diminished rather than heightened by such a procedure.

Finally, the fact that Moreno was required to remove his coat to facilitate the search is of no consequence under the circumstances of this case. His devious conduct, hesitation, and suspi-

---

8. Customs officials conducting border searches have always been exempt from the usual fourth amendment requirement that searches be based on probable cause. Aside from the historical argument that this exception has always been recognized, it is also justified by the vital national interest in preventing illegal entry and smuggling, particularly of narcotics. Although under some circumstances searches can be conducted away from the border crossing area, all persons searched must be shown to have come through that critical zone to make this exception to the warrant requirement applicable. The mere suspicion of possible illegal activity is enough cause to justify a border search. See United States v. Warner, 441 F.2d 821, 832 (5th Cir. 1971); Validity of Border Searches and Seizures by Customs Officers, 6 A.L.R.Fed. 317 (1971). Our discussion of border searches is by way of analogy. We do not propose to substitute the "suspicion standard" applicable in border search cases for the *Terry v. Ohio* standard which is the basis for our decision.

cious actions constituted sufficient reasons to support the officer's decision to determine exactly what was causing the bulge in his coat. Airport security officials had a legitimate interest in making a conclusive determination with respect to Moreno's conduct and presence in the airport. The removal of Moreno's coat was a necessary step in this determination, particularly in view of his refusal to remove the contents of his coat pocket after he was asked to do so.

## V

Having concluded that the heroin admitted into evidence in this case was the product of a valid search, we hold that the trial court did not err in denying Moreno's motion to suppress. We likewise find no error with respect to Moreno's second contention that the evidence was insufficient to establish beyond a reasonable doubt an intent to distribute the heroin. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L. Ed. 680 (1942); United States v. McGlamory, 441 F.2d 130, 134–135 (5th Cir. 1971).

Judgment affirmed.