**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**William FERN, Defendant-Appellant.**

**No. 72-1284.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 21, 1973.

Decided Sept. 20, 1973.

Lawrence S. Galka, Robert S. Bailey, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., William T. Huyck, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before STEVENS, Circuit Judge, GRANT,* Senior District Judge, and

GORDON,** District Judge.

GRANT, Senior District Judge.

William Fern was convicted by the court below of knowingly possessing a quantity of heroin and opium in violation of 21 U.S.C. § 841(a)(1). He was sentenced to the custody of the Attorney

---

8. The same circumstance was present in United States v. Hulsey, 463 F.2d 1071, 1075 (7th Cir. 1972), on which *Weaver* relied.

---

* Senior District Judge Robert A. Grant of the United States District Court for the Northern District of Indiana sitting by designation.

** District Judge Myron L. Gordon of the United States District Court for the Eastern District of Wisconsin sitting by designation.

General for five years imprisonment. Defendant was tried by the district court on the basis of stipulated evidence which had been adduced at a pre-trial hearing on a motion to suppress, the motion having alleged a fourth amendment violation. The sole issue presented on appeal is whether a search of defendant at the airport by deputy marshals violated the Fourth Amendment's prohibition against unreasonable searches and seizures.

On 9 September 1971, at approximately 12 o'clock midnight, Deputy United States Marshal Paul Pongrace, assigned to the Air Piracy Detail at O'Hare Airport, was observing passengers who were waiting to board an American Airlines flight to San Francisco. Deputy Pongrace noticed defendant Fern sitting in a lounge in the boarding area. It appeared to Deputy Pongrace that the defendant was pretending to read a newspaper and thereby conceal the fact that he was glancing about at the people around him. He observed defendant change his seat several times, leaving a carryall suit bag behind but at all times clutching a white flight bag. Prior to the 12:05 departure time, Deputy Pongrace checked with the ticket agent and was informed that defendant had purchased a one-way ticket to San Francisco. He then determined that Fern met the basic characteristics of the air piracy personality profile. Pongrace and a second deputy marshal positioned themselves at the boarding gate in order to check the identification of Fern and another profile selectee. When Fern approached, the marshals identified themselves and asked defendant for some personal identification. He produced a New York State driver's license in the name of William Fern and a Canadian citizenship paper bearing the name of "Gum Chien Leong". He claimed that he lived in San Francisco but, when asked where in San Francisco he resided, he answered that he did not know the address. He also claimed that he was traveling from New York to San Francisco although his ticket stub showed that he had boarded in Chicago. Throughout the encounter defendant stammered, "perspired profusely" and exhibited other numerous mannerisms.

A search of defendant's person produced nothing. However, at the conclusion of the search defendant suddenly backed up against the jetway wall. Deputy Pongrace grabbed his flight bag and felt a hard object like a weapon. He handed the bag to the other deputy to be searched. The marshal opened the bag and pulled out a hair dryer. A further search revealed a clear, plastic bag filled with heroin and two newspaper-wrapped bricks of smoking opium.

Defendant contends that had the marshals sought a search warrant prior to the search, they would not have been able to establish probable cause justifying the issuance of a search warrant. Nor, argues defendant, does the case involve consent, hot pursuit, exigent circumstances, or something in plain view— any of which would constitute an exception to the general rule excluding evidence obtained as a result of a warrantless search and seizure. Finally, recognizing the possible applicability of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968), defendant argues that Deputy Pongrace did not have knowledge of sufficient "specific and articulable facts" so as to "reasonably warrant" the search involved. 392 U.S. at 21, 88 S. Ct. 1868.

Defendant admits that in three recent decisions the Courts of Appeals for the Second, Third and Fourth Circuits [1] have sustained narcotics seizures in cases comparable to the case at bar. United States v. Bell, 464 F.2d 667 (2nd Cir. 1972); United States v. Epperson, 454 F.2d 769 (4th Cir. 1972); United States v. Lindsey, 451 F.2d 701 (3rd Cir. 1971).

[1]. Since the instant case was argued here, the 5th Circuit in two separate decisions handed down June 14, 1973, United States v. Skip-
with, 482 F.2d 1272, and United States v. Legato, 480 F.2d 408, have also sustained narcotics seizures in similar situations.

However, he contends that each case is distinguishable on its facts from his case. He notes that in both *Bell* and *Epperson,* a magnetometer (a metal detecting device) was utilized and revealed a high metallic content on the defendants which neither defendant was able to explain. Defendant suggests that in each case the magnetometer results provided the reasonably articulate level of suspicion of physical danger which justified the search and seizure. Thus, he argues that the failure to use the magnetometer in his case precluded a *Terry* showing which could have justified the search and seizure. In *Lindsey,* the marshal had also observed the nervous mannerisms of the defendant and, when he asked the defendant for identification, was given conflicting identifications. Having noted bulges in Lindsey's coat pocket, the marshal conducted a pat-down search and found the bulges "very solid". He extracted from the pocket two aluminum-wrapped packages later found to contain heroin. Because of the possibility of an airplane highjacking and the limited time the marshal had to act, the court held that "the level of suspicion required for a *Terry* investigative stop and protective search should be lowered." 451 F.2d at 703. Defendant characterized this holding as "a drastic constitutional principle . . . justified solely on the basis of the danger that skyjacking presents."

■ The government contends that the *Terry* decision clearly establishes that the reasonable suspicion required to justify an investigatory stop is determined by the context of each case, *i. e.,* a flexible rather than a fixed standard. It correctly notes that the Supreme Court established a balancing test in which "the governmental interest which allegedly justifies official intrusion" *is* balanced against the particular invasion of "the constitutionally protected interests of the private citizen" caused by the search and seizure. *Terry, supra,* 392 U.S. at 21, 88 S.Ct. at 1879. The governmental interest includes not only the prevention of crime, but also the protection

of the officer and "other prospective victims of violence." *Id.* at 24, 88 S.Ct. at 1881.

■ In the instant case the government argues that the governmental interest in preventing the crime of skyjacking at the only point where such prevention is practical, *i. e.,* on the ground, and its interest in protecting "other prospective victims of violence", *i. e.,* the airline passengers, justified not only the stop of defendant but also the search of his flight bag. In addition, it argues that the marshals possessed knowledge of an ample number of "specific and articulable facts" to justify the search of the defendant. Besides their observation of defendant's suspicious behavior and the conflicting identifications for which defendant was unable to offer a satisfactory explanation, the marshals had determined that defendant met the basic characteristics of the air piracy personality profile used by the Federal Aviation Administration. With reference to defendant's criticism that the characteristics constituting the air piracy profile were too limited in number and too broad in scope, the government notes the testimony of John T. Dailey, a psychologist for the Federal Aviation Administration. At trial Dr. Dailey cited a study of 60 prior airplane skyjackings which revealed that all 60 of the skyjackers fit the characteristics of the profile, whereas only one per cent of all airplane passengers fit the profile.

Concerning defendant's contention that the use of a magnetometer should be an important, if not essential, prerequisite to an airport-boarding search, the government cites additional testimony of Dr. Dailey to the effect that the magnetometer is not indispensable to the successful operation of the anti-skyjacking system and in fact can be separated. *Lindsey, supra,* is also cited as authority for the proposition that the use of a magnetometer is not an absolute prerequisite to an airport-boarding search.

We find considerable merit in each of the arguments advanced by the govern-

ment. The authorities cited provide ample support for its position that sufficient "specific and articulable facts" existed to justify the marshals' stop of defendant and the search of his flight bag. The facts available to the marshals would have clearly warranted a man of reasonable caution in the belief that the action taken was appropriate. *Terry, supra,* 392 U.S. at 22, 23, 88 S.Ct. 1868. The governmental interests which justified the stop and search are so obvious and of such vital importance that courts are now "treating airport security searches as an exceptional and exigent situation under the Fourth Amendment." United States v. Moreno, 475 F.2d 44, 48 (5th Cir. 1973).

As was well stated by the 5th Circuit in *Legato,*

> In United States v. Moreno . . , this court recognized that the public danger posed by air piracy has transformed the airport into a "critical zone where special fourth amendment considerations apply."
>
> \* \* \* \* \* \*
>
> [T]he Moreno court made it clear that such an intrusion is not unconstitutional if it is based upon a particularized set of facts which reasonably substantiates the investigating officer's belief that the individual searched was armed in some fashion and hence a threat to air security. United States v. Legato, *supra.*

Commenting on that question of reasonableness, the 5th Circuit in Skipwith stated as follows:

> In the critical pre-boarding area where this search started, reasonableness does not require that officers search only those passengers who meet a profile or who manifest signs of nervousness or who otherwise appear suspicious. Such a requirement would have to assume that hijackers are readily identifiable or that they invariably possess certain traits. The number of lives placed at hazard by this criminal paranoia forbid taking such deadly chances. . . . United States v. Skipwith, *supra.*

We are not troubled by the fact that the marshals extended their search to include defendant's flight bag. The following passage from the *Moreno* decision demonstrates why airport security officers have not been limited to the traditional stop and frisk:

> In applying *Terry,* were we to hold that airport security officials must always confine themselves to a "pat down" search where there is a proper basis for an air piracy investigation, we think that such a per se restriction in the final analysis would be self-defeating. We have already pointed out that the hijacker can conceal explosives or weapons in places which might be overlooked in the course of a cursory pat down. It should be emphasized that such a search is not primarily for the investigating officer's protection, but rather for the protection of a distinct and uniquely threatened class—this nation's air carriers, their crews and passengers. 475 F.2d at 51.

The judgment of the district court is affirmed.

MYRON L. GORDON, District Judge (dissenting).

I respectfully dissent. The issues presented by the instant case are two-fold: first, whether probable cause existed for the search and secondly, whether the appellant voluntarily consented to the search. I find neither probable cause nor consent.

Airport searches have provoked a large amount of recent litigation. See such decisions as United States v. Ruiz-Estrella, 481 F.2d 723 (2d Cir., 1973); United States v. Moreno, 475 F.2d 44 (5th Cir. 1973); United States v. Skipwith, 482 F.2d 1272 (5th Cir., 1973); United States v. Legato, 480 F.2d 408 (5th Cir., 1973); United States v. Davis, 482 F.2d 893 (9th Cir., 1973); United States v. Doran, 482 F.2d 929 (9th Cir., 1973); United States v. Echols, 477 F.2d 37 (8th Cir., 1973); United States v. Kroll, 481 F.2d 884 (8th Cir., 1973), and United States v. Wilkerson, 478 F.2d 813 (8th Cir., 1973).

I do not believe that the type of "stop and frisk" situation discussed in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) is applicable here. In *Terry*, the Court determined that a "frisk" or limited search for weapons "constitutes a severe, though brief, intrusion upon cherished personal security", but the Court concluded at p. 29, 88 S.Ct. at p. 1884:

". . . The sole justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."

There is no inherent right to travel to a certain place in a particular aircraft. Accordingly, airline authorities may condition the sale of a ticket or permission to board the airplane upon a person's consent to be searched for weapons, explosives, and the like. One's consent to such a search should be reasonably express; it should not be broadly implied because the consent to a search amounts to a waiver of a fundamental constitutional right. Waiver in this context means the "intentional relinquishment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

It is clear from the facts of this case that the search of the appellant's handbag conducted here cannot be brought within the ambit of *Terry*.

The mere fact that the appellant fitted a "behavioral profile" does not constitute probable cause for the search in this case. Moreover, when faced with a heated issue such as this, I think we might reflect on the unfortunate ruling in Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), before approving the search in this case.

In the recent case of Condrado Almeida-Sanchez v. United States, 413 U.S. 266, 274, 93 S.Ct. 2535, 2540, 37 L.Ed.2d 596 (1973), the Court said:

". . . It is well to recall the words of Mr. Justice Jackson, soon after his return from the Nuremberg Trials:

'These [Fourth Amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among the deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.' Brinegar v. United States, 338 U.S. 160, 180 [69 S.Ct. 1302, 1313, 93 L.Ed. 1879] (Jackson, J., dissenting).

"The Court that decided Carroll v. United States, ante [267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543], sat during a period in our history when the Nation was confronted with a law enforcement problem of no small magnitude —the enforcement of the Prohibition laws. But that Court resisted the pressure of official expedience against the guarantee of the Fourth Amendment."

I believe that the evidence was illegally seized and must therefore be suppressed. Accordingly I would reverse.