[Crim. No. 22565. Second Dist., Div. Five. May 16, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
PAUL ARTHUR KLUGA, Defendant and Appellant.

## COUNSEL

Herbert F. Blanck, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Russell Iungerich and Daniel W. McGovern, Deputy Attorneys General, for Plaintiff and Respondent.

# OPINION

**STEPHENS, J.**—By information, defendant was charged in count I with possession of marijuana (Health & Saf. Code, § 11530), and in count II, with possession of an amphetamine (Health & Saf. Code, § 11910). Defendant pleaded not guilty. Defendant's motion pursuant to Penal Code section 1538.5 was submitted on the transcript of his preliminary hearing and was denied. Defendant submitted count I on the transcript of his preliminary hearing. Defendant was found guilty of count I, and count II was dismissed in the furtherance of justice. Defendant's motion for a new trial was denied. Proceedings were suspended, and defendant was granted four years' probation upon the condition, among others, that defendant first spend one year in county jail. Defendant appeals.

At defendant's preliminary hearing, United States Marshal Wayne Kratzer testified that on April 18, 1972, he was "working Anti-Hijack Detail at the Los Angeles Airport." While Kratzer was working on the gate of a Pan Am flight that was bound for South America, defendant was brought to him "for further processing" because defendant had had "a high metal reading" on the magnetometer. Kratzer asked defendant if defendant had any property that might explain the high metal reading of the magnetometer. Defendant showed Kratzer several coins and keys. Kratzer then asked defendant for permission to conduct a patdown search, and defendant consented. Kratzer noticed a bulge in defendant's jacket pocket. Kratzer asked defendant about the bulge, and defendant took a package of cigarettes from the pocket. Kratzer then patted defendant down and "found a bulge in each leg, inside [defendant's] boot. . . ." Kratzer asked defendant "to remove it, which he did," "One bulge turned out to be [a second] package of cigarettes." Kratzer did not squeeze the package, and the package had the weight of an ordinary cigarette package. The package was unusual, however, in that "inside the package of cigarettes was another package of cigarettes." Kratzer examined the contents of that package, and found 17 hand-rolled cigarettes which he believed to contain marijuana. Defendant also took a small, black bottle from his boot, and it was later determined that the bottle contained amphetamines.

At defendant's (Pen. Code) section 1538.5 hearing, he argued in effect that the seizures were illegal on the ground that his detention and search were not within the scope of *Terry* v. *Ohio*, 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868].[1] In opposition, the People argued that the "circumstances

---

[1]Specifically, defendant relied upon the cases of *Pendergraft* v. *Superior Court*, 15 Cal.App.3d 237 [93 Cal.Rptr. 155]; *People* v. *Lingo*, 3 Cal.App.3d 661 [83 Cal.

of this airport search-type situation certainly justify the marshal investigating the bulge he found on the defendant's person." The judge upheld the seizures, but did not specifically state his reason. The judge did state, however, that "I think the circumstances of finding two bulges in each boot of the defendant, and if I were looking for weapons—it is a peculiar place to carry a bottle and a pack in another leg—and if I were looking for explosives I certainly would examine them."

On appeal, defendant contends that his search by Kratzer was illegal,[2] and that the court therefore erred in refusing to suppress from evidence the fruits of that search. We, however, do not agree that that search was illegal.

We, of course, do not know the judge's specific ground for upholding the search, but we, as an appellate court, must uphold a correct lower court ruling irrespective of the lower court's reason for its ruling. (Witkin, Criminal Procedure, § 682, subd. (f); Witkin, Cal. Procedure (2d ed. 1970) Appeal, §§ 226-228.) It was, of course, the People's burden to demonstrate the legality of the search, and the People argued at the 1538.5 hearing that the search was valid because of the "circumstances of this airport search-type situation. . . ." We agree with the substance of the People's argument. We do not feel compelled to hide our heads in the sands of limited rationale or even possible peripheral citations or argument on the law.[3]

■ At the time of defendant's search, there existed a Federal Aviation Administration regulation (14 C.F.R. 121.538; hereinafter, the regulation) that controlled airlines-boarding searches. The Administrator of the Federal Aviation Administration explained the purpose of the regulation as follows: "The purpose of this amendment is to require certain air carriers and commercial operators . . . *to adopt and put into use, within 72 hours* after the amendment becomes effective [amendment effective February 2, 1972], a screening system acceptable to the Administrator, to prevent or deter the carriage aboard its aircraft of sabotage devices or weapons in carry-on baggage or on or about the persons of passengers.

---

Rptr. 755]; and *People* v. *Collins*. Defendant gave no reference citation for the *Collins* case, but it is probable that defendant was referring to *People* v. *Collins*, 1 Cal.3d 658 [83 Cal.Rptr. 179, 463 P.2d 403].

[2]Specifically, defendant's brief on appeal states that "defendant does not question the validity of the magnetometer search, but rather questions the justification of the following search by Officer Kratzer."

[3]The dissent erroneously stresses *People* v. *McKinnon*, 7 Cal.3d 899 [103 Cal. Rptr. 897, 500 P.2d 1097]. It fails to recognize that the search which took place in *McKinnon* occurred nearly two years before the promulgation of the anti-hijacking regulations which were in force and effect at the time of the search in the instant case.

"Notice 71-29 was issued on September 28, 1971, and published in the Federal Register on September 29, 1971 (36 F.R. 19172), proposing the issue of regulations to provide aviation security standards . . . . That proposal would require, among other things, that each of these operators prepare in writing and submit for approval by the Administrator its security program showing the procedures, facilities, or screening system, or a combination thereof, that it uses or intends to use for the purposes here involved. The closing date for comments was December 29, 1971, and due consideration has been given to all comments presented in response to that notice.

"As proposed, the [airline] would have a 90-day period in which to submit its security program to the FAA for approval. However, because of alarmingly increased highjackings including extortion of large sums of money that have occurred recently, the Administrator is of the opinion that an emergency *requiring immediate action exists* in respect of safety in air commerce, and that this amendment [the regulation] is essential in the interest of safety in air commerce, particularly in air transportation, to meet that emergency. Accordingly, as issued, this amendment [the regulation] requires the [airline] to adopt and put into use a pasesnger and baggage screening system acceptable to the Administrator within 3 days after the effective date of the amendment. . . ." (37 Fed. Reg. 2500; italics added.)

The regulation itself provides that the airlines must have, "before February 6, 1972 . . . . a screening system, acceptable to the Administrator . . . to prevent or deter the carriage aboard its aircraft of any explosive or incendiary device or weapon in carry-on baggage or on or about the persons of passengers. . . ." (14 C.F.R. 121.538,. ¶ (b)—Feb. 2, 1972,[4] 37 Fed. Reg. 2500, 4904, 5254 and 7150; see also, 14 C.F.R. 107

---

[4]As the second step of the anti-hijacking scheme of 14 Code of Federal Regulations 121.538, the airlines were required to "prepare in writing and submit for approval by the Administrator its security program including the screening system prescribed by paragraph (b) . . . , and showing the procedures, facilities, or a combination thereof, that it uses or intends to use to support that program and that are designed to—

"(1) Prevent or deter unauthorized access to its aircraft;

"(2) Assure that baggage is checked in by a responsible agent or representative. . . . ; and

"(3) Prevent cargo and checked baggage from being loaded aboard its aircraft unless handled in accordance with the . . . security procedures [¶ (c)].

"  .     .     .     .     .     .     .     .     .     .     .     .     .     .

"(e) Within 60 days after receipt of the program, the Administrator approves the program or notifies the [airline] to modify the program to comply with the applicable requirements . . . .

"  .     .     .     .     .     .     .     .     .     .     .     .     .     .

"(h) Each [airline] shall at all times maintain and carry out the screening system

(March 18, 1972), 37 Fed. Reg. 5689.) The genesis and basis for the extent of defendant's search, therefore, lay in an administrative regulation, whether argued or not.[5]

In regard to administrative searches, we consider two recent decisions of the United States Supreme Court.

In *Colonnade Corp.* v. *United States,* 397 U.S. 72 [25 L.Ed.2d 60, 90 S.Ct. 774], federal agents went to a catering establishment to investigate possible violations of certain liquor excise tax laws. The agents asked the catering establishment's manager to open a locked liquor storeroom. The manager refused, and the agents entered by force and seized certain bottles of liquor. The Supreme Court recognized that "[a]s respects [the liquor] industry, and its various branches including retailers, Congress has broad authority to fashion standards of reasonableness for searches and seizures" (*id.* at p. 77 [25 L.Ed.2d at p. 65]), but found that the agent's entry was illegal because the statutory law did not provide for forcible entries.

In *United States* v. *Biswell,* 406 U.S. 311 [32 L.Ed.2d 87, 92 S.Ct. 1593], the Supreme Court considered the constitutionality of a congressional statute that "authorizes official entry during business hours into 'the premises (including places of storage) of any firearms or ammunition . . . dealer . . . for the purpose of inspecting or examining (1) any records or documents required to be kept . . . and (2) any firearms or ammunition kept or stored by such . . . dealer . . . at such premises.' [Fn. omitted.] 18 U.S.C. § 923(g)." (*Id.* at pp. 311-312 [32 L.Ed.2d at p. 90].) In upholding the constitutionality of this statute, the Supreme Court wrote that "[f]ederal regulation of the interstate traffic in firearms is not as deeply rooted in history as is governmental control of the liquor industry [referring to *Colonnade*], but close scrutiny of this traffic is undeniably of central importance to federal efforts to prevent violent crime and to assist the States in regulating the firearms traffic within their borders. [Citation.] Large interests are at stake, and inspection is a crucial part of the regulatory scheme,

---

prescribed by paragraph (b) . . . and the security program approved [by the Administrator]."

14 Code of Federal Regulations 121.538, paragraph (b), however, was in effect as of the date of defendant's arrest, and although paragraph (b) reads that the screening system must be "acceptable to the Administrator," it is abundantly clear from a reading of the entire regulation and the Administrator's explanation of the regulation, that while the paragraph (b) screening system was subject to the control of the Administrator, the implementation of the paragraph (b) screening system was not subject to a condition precedent of the Administrator's approval.

[5]We do not suggest that the People argued, or that the judge considered, this regulation.

since it assures that weapons are distributed through regular channels and in a traceable manner and makes possible the prevention of sales to undesirable customers and the detection of the origin of particular firearms." (*Id.* at pp. 315-316 [32 L.Ed.2d at p. 92].) The Supreme Court went on to write: "We have little difficulty in concluding that where, as here, regulatory inspections further urgent federal interest and the possibilities of abuse and the threat to privacy are not of impressive dimensions, the inspection may proceed without a warrant where specifically authorized by statute." (*Id.* at p. 317 [32 L.Ed.2d at p. 93].)

In regard to the case before us, certainly, if Congress has "broad authority to fashion standards of reasonableness for searches and seizures" as to liquor excise tax laws (*Colonnade* at p. 77 [25 L.Ed.2d at p. 65]), and if "[l]arge interests are at stake" as to Congress' regulating the sale of firearms (*Biswell* at p. 315 [32 L.Ed.2d at p. 92]), then the President, through the Federal Aviation Administration, must have at least as great an interest in preventing the international terror of an airline hijacking. We conclude, therefore, that so long as an airline boarding search is limited to the scope that is "reasonably necessary" to effectuate the policies of the regulation, the search is then reasonable within the meaning of the Fourth Amendment. (Cf. *Airport Security Searches and the Fourth Amendment,* 71 Colum. L.Rev. 1039, 1055-1057.)

However, since the regulation was directed to the airlines and was not directed to United States Marshals, we next consider the question of whether the regulation was applicable to Kratzer. We believe that it was. One legal commentator has stated that "government encouragement of and cooperation with [airlines'] security measures has been so extensive that one industry spokesman has characterized the effort as the product of a 'working government-industry team.' [Fn. omitted.]" (*Airport Security Searches and the Fourth Amendment, supra,* at p. 1045.)

United States Marshal Kratzer testified that he was "working Anti-Hijack Detail at the Los Angeles Airport." It is clear, therefore, that Kratzer stood both in the position of a United States Marshal, and in the position of a member of the Federal Aviation Administration's anti-hijack program. It would follow, then, that the "government-industry team" relationship between the airlines and the United States Marshals brought Kratzer within the regulation directed to the airlines.[6]

---

[6]For information only, and not as evidentiary support in this case, we note that this "government-industry team" relationship is demonstrated by Federal Aviation Administration, Office of Air Transportation Security, Air Security Bulletin 72-1 (Mar. 6, 1972): "Reference 14 CFR 121.538 . . . International Plan . . . Passengers who

Finally, we consider the question of whether defendant's search was reasonable. ■ "Where [a regulation] has authorized inspection but made no rules governing the procedure that inspectors must follow, the Fourth Amendment and its various restrictive rules apply." (*Colonnade Corp.* v. *United States, supra,* 397 U.S. 72, 77 [25 L.Ed.2d 60, 64].) ■ The test, then, is whether Kratzer's search was within the scope that was reasonably necessary to effectuate the policies of the regulation. We believe that it was. Defendant failed the magnetometer test, but showed Kratzer only coins and keys. Defendant had a package of cigarettes in his jacket pocket, but Kratzer found that one of the bulges in defendant's boots was what appeared to be another package of cigarettes. The cigarette package in the boot, however, was unusual in that it was contained within another cigarette package. The judge stated that he thought that under these circumstances, defendant's having a cigarette package inside of the boot was "peculiar," and that if he were looking for explosives, he "certainly would examine them." We agree. In light of the composition and reduced sizes of the modern exotic explosive and incendiary devices,[7] we find that Kratzer was justified in asking defendant to remove the bulging objects from the boots, and in light of the fact that defendant was known to have had one package of cigarettes in his jacket pocket, we find that Kratzer was justified in examining the "double" cigarette package that was produced from the bulge in defendant's boot. In comparison, the invasion of defendant's privacy was minimal and, on balance, is outweighed by the rights of the passengers and their families to travel in safety and peace of mind, by the right of the airline industry to be protected from criminal extortion and destruction,

. . . alarm the magnetometer . . . are processed by law enforcement officials." Further, effective December 6, 1972, the FAA ordered airports to have "[a]t least one law enforcement officer . . . present at the point of, and prior to and throughout, the final passenger screening process prior to boarding, . . ." (14 C.F.R. 107.4, ¶ (a), 37 Fed. Reg. 25935.) " '[L]aw enforcement officer' means an armed person . . . [v]ested with a police power of arrest under Federal, State, or other political subdivision authority. . . ." (14 C.F.R. 107.1, ¶ (e), 37 Fed. Reg. 25934.)

[7] 14 Code of Federal Regulations 103.7 provides in part that "[n]o person may carry any dangerous article in a passenger-carrying aircraft . . . ." The code sets forth in detail those articles that are characterized as dangerous (14 C.F.R. 103.1; 49 C.F.R. 170-189), but for our purposes, it is necessary only to say that many of these articles are smaller and lighter than a package of cigarettes. The Fifth Circuit of the United States Court of Appeals has recognized recently that "modern technology has made it possible to miniaturize to such a degree that enough plastic explosives to blow up an airplane can be concealed in a toothpaste tube. A detonator planted in a fountain pen is all that is required to set it off." (*United States* v. *Moreno,* 475 F.2d 44, 49 (5th Cir., No. 72-2484, dec. Mar. 12, 1973.) Further, the "letter bomb" that was used to kill an agricultural counselor in the Israeli Embassy in London weighed approximately one ounce and was "roughly the size and shape of a teabag." (Newsweek, Oct. 2, 1972, at p. 30.)

and by the right of our government to be secure in its delivery of mail and administration of interstate commerce.

In summary, we hold that the regulation is constitutionally valid, that United States Marshal Kratzer was acting within the regulation, and that defendant's search did not exceed constitutional limits and was within the scope that was reasonably necessary to effectuate the policy of the regulation and the protection required.

Further, since we are upholding defendant's search as being within the extent made permissible by the regulation, we need not extend our consideration to whether the search would have been valid pursuant solely to *Terry* v. *Ohio, supra,* 392 U.S. 1, without the regulation.[8] We do note, however, that there exists authority to the effect that the *Terry* v. *Ohio* standard is less strict when applied to airlines-boarding searches. (*United States* v. *Moreno, supra,* 475 F.2d 44 (5th Cir., No. 72-2484, dec. Mar. 12, 1973.) The regulation clearly spells out the need for the type of search here conducted, and the theory of *Terry* v. *Ohio, supra,* that approves reasonable search for protective purposes is incorporated into the regulation.

The judgment is affirmed.

Ashby, J., concurred.

**KAUS, P. J.**—Dissenting.

The Fourth Amendment is not the hijacker's license to do business. We

---

[8]The dissent's reliance upon *People* v. *Miller,* 7 Cal.3d 219 [101 Cal.Rptr. 860, 496 P.2d 1228] is totally misplaced. *Miller* (an arrest on an outstanding traffic warrant) says in part (at p. 226, fn. 1): "Although the officer must suspect that an individual has committed the elements of a crime in order eventually to establish probable cause to arrest for commission of that crime, the officer need not *articulate* all his suspicions at the time of arrest, so long as he informs the arrestee of at least one 'cause of the arrest.'" The same reasoning applies with equal force to a search. *Miller* is not concerned with a consensual pat-down search, but rather a search conducted as "incident to an arrest." We therefore are here concerned not with the legality of a search, but with the extent of the search. We note also that in *People* v. *Superior Court (Simon),* 7 Cal.3d 186 [101 Cal.Rptr. 837, 496 P.2d 1205] (the companion case to *Miller*), the officer specifically articulated he had no fear for his safety, while in the instant case the United States Marshal searched as he believed necessary to eliminate any cause of fear by plane passengers and others, not fear for himself. The articulation of the purpose for which Kratzer was performing his activities encompassed his belief that the examination of the cigarette package was to ascertain the presence of an explosive, or like weapon.

all agree on that. The trouble with this case is not that the record unerringly demonstrates that Kratzer, the United States Marshal, violated defendant's rights. Rather, it is that a slipshod presentation of the evidence of Kratzer's justification for the invasion of defendant's privacy leaves the record without any substantial evidence in support of the trial court's ruling on the motion to suppress.[1] This case has nothing to do with airplane safety. It is, instead, a lesson in how not to prove a prima facie case.

The evidence is fully and correctly set forth by the majority. What is not stated—because it is not there—is any articulation by Kratzer that his search of the cigarette package was in any way related to airplane safety.[2] The thought that it was reasonable to suspect that the package contained explosives was the court's. Judicial imagination is, however, no substitute for evidence. The principle recognized in *People* v. *Miller,* 7 Cal.3d 219, 226 [101 Cal.Rptr. 860, 496 P.2d 1228] is obviously based on the prophylactic rationale that officers should not be encouraged to make whimsical searches, secure in the belief that some smart prosecutor or judge will figure out a legal basis for their actions.

While one may suspect that Kratzer's actions were related to the reason for his presence at the airport, unfortunately nobody ever asked him why he became so curious about the contents of defendant's package of cigarettes.[3]

---

[1] In the absence of a relevant and constitutional statute or administrative regulation, the courts will have to work out the criteria for permissible invasions of passengers' persons on a case-by-case basis. I am inclined to believe that the majority is correct and that cases such as *United States* v. *Moreno,* 475 F.2d 44 (5th Cir., No. 72-2484, decided Mar. 12, 1973) are on the right track. In brief, they attempt to solve the problem by way of analogy to the rule of *Terry* v. *Ohio,* 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868] and the substantial body of law which has developed in connection with border searches.

[2] Also unrelated—because it is not there either—is any evidence that any airline employee had anything to do with the search, either as a member of a "government-industry team" or as a truly private party. The simple fact is that on our record this search was not merely government inspired (cf. *Stapleton* v. *Superior Court,* 72 Cal.2d 97, 102-103 [73 Cal.Rptr. 575, 447 P.2d 967]), it was wholly government executed. It escapes me just what an F.A.A. regulation, which tells carriers how to run their airlines, has to do with this case.

[3] The majority seems to assume that Kratzer noticed that the package he retrieved from defendant's boot contained a second package, without opening the first. The record is silent on the point.

Defendant's guilt is plain and there is no reason why the conviction should be reversed if the search was legal. The proper disposition of this case is to return it to the trial court for the purpose of conducting another hearing on defendant's motion to suppress. (Pen. Code, § 1260.)[4]

Appellant's petition for a hearing by the Supreme Court was denied July 12, 1973.

---

[4]Extended comment on the majority's curious venture into the wonderland of the Code of Federal Regulations—neither here nor below suggested by the People—would be counterproductive. If slogans or F.A.A. regulations can abrogate constitutional rights by transmuting U.S. Marshals into airline employees, one wonders why, in *People* v. *McKinnon,* 7 Cal.3d 899, 911-916 [103 Cal.Rptr. 897, 500 P.2d 1097], the court went to such lengths to show that an airline search was free from police involvement. There is simply no way to reconcile the accepted rule that searches by private individuals are not subject to Fourth Amendment strictures if and only if the police are not involved, with the majority's discovery that an illegal police search is all right if the officer has made a mythical "government-industry team."