DENNIS, Circuit Judge,
dissenting:
I disagree with the majority’s conclusion that the school board has shown that this case falls within the closely guarded “special needs” category recently recognized by the Supreme Court within which state officials without reasonable individualized suspicion of wrongdoing may require a person to submit to an urinalysis drag test. In this case the school board, without reasonable individualized suspicion that a janitor’s urine contained evidence of illegal drag usage, randomly selected and ordered him to submit to a urinalysis drag test, on pain of disciplinary action which could result in termination. The janitor was subjected to urinalysis under the school board’s random drug-testing program, which appears to cover mandatorily all manual labor school board employees, while notably omitting any such requirement of teachers, principals, and administrative and clerical personnel.
The school board compelled drag test effected a search within the meaning of. the Fourth and Fourteenth Amendments. The decisions of the Supreme Court clearly require that state officials have an individualized reasonable suspicion that illegal drug-use evidence is contained in a person’s urine before ordering him to submit to an urinalysis drug test. The majority’s erroneous conclusion that the state’s proffered “special need” for drug testing justified the suppression of the Fourth Amendment’s normal requirement of individualized suspicion led to its mistaken affirmance of the district court’s *566 summary judgment rejecting the janitor’s petition for injunctive relief and damages. The majority’s decision also conflicts in principle with a previous decision of this court. Accordingly, I respectfully dissent.
That the school board’s actions invaded an expectation of privacy that society is prepared to recognize as reasonable is not disputed. ‘“There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom.’ ” Skinner v. Railway Labor Executives’ Ass’n, 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (quoting National Treasury Employees Union v. Von Raab, 816 F.2d 170, 175 (5th Cir.1987)). “Because it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable, the Federal Courts of Appeals have concluded unanimously, and we agree, that these intrusions must be deemed searches under the Fourth Amendment.” Id. (footnote omitted).
The decisions of the Supreme Court require that state officials have an individualized reasonable suspicion that a person’s urine contains evidence of illegal drug use before ordering him to submit to an urinalysis drug test. The Supreme Court, in Skinner v. Railway Labor Executives’ Association, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and National Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), recognized a “special needs” category of cases involving train operators and Customs Service agents and permitted suspieionless government mandated urinalysis of such persons under the particular and unique circumstances and regulated drug testing programs in those cases. Previously, Supreme Court Justices, in dicta and separate opinions, had spoken of “special needs” in contexts other than urinalysis drug testing but clearly had not designated a “special needs” category for suspieionless searches or seizures. Subsequent to Skinner and Von Raab the Supreme Court, in Vernonia School District 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), recognized a “special needs” category for suspieionless random sample urinalysis of secondary school athletes, who, as a condition of eligibility for interscholastic athletics, had signed forms consenting to the test and had obtained written consent from them parents, under the particular, unique circumstances involving an “immediate crisis” caused by a sharp increase in drug use by students.
Recently, in Chandler v. Miller, 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997), the Supreme Court held that a state’s statutory requirement that candidates for state office submit to an urinalysis drug test does not fit within the closely guarded “special needs” category of constitutionally pennissi-ble suspieionless searches established by Skinner, Von Raab, and Vernonia and that those precedents remain the guides for determining whether any proffered “special needs” for suspieionless drug testing passes constitutional muster. In the present case, it is clear that the school board’s requirement that an adult janitorial worker submit to urinalysis drug testing, which was not based on reasonable individualized suspicion, did not fit within the closely guarded “special needs” category of constitutionally permissible suspieionless searches, because the random drug test order was not supported by a showing of any of the factors necessary to justify a “special needs” category and suspi-cionless drug testing policy or program.
The Fourth Amendment provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
Until the late 1960’s, the steadfast rule was that in order for a search to be “reasonable,” law enforcement officials must first obtain a warrant from a neutral and detached magistrate by establishing probable cause that a law had been violated, and that in the few *567 specific situations in which obtaining a warrant was deemed impracticable probable cause was still required. See, e.g., Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925). As the Supreme Court considered nontraditional applications of the Fourth Amendment, however, such as searches by public inspections officials, see Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), and frisks by police officers, see Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), it found it needed more flexibility than the warrant and probable cause requirements could provide. The Court began, in limited circumstances, to recognize specific permissible departures from the traditional probable cause requirement, after “balancing the need to search against the invasion which the search entails”. Camara, 387 U.S. at 537, 87 S.Ct. 1727; accord Terry, 392 U.S. at 21, 88 S.Ct. 1868. “Those departures have been of two different kinds: (1) [those] requiring only lesser individualized suspicion, [and] (2) [those] requiring no individualized suspicion but only a random or other nonarbitrary selection proeess[.]” Wayne R. LaFave, Computers, Urinals, and the Fourth Amendment: Confessions of a Patron Saint, 94 Mich. L. Rev. 2553, 2575-1576 (1996)[herein-affcer LaFave]; cf. Terry, 392 U.S. 1, 88 S.Ct. 1868; Camara, 387 U.S. 523, 87 S.Ct. 1727.
Each situation in which the Supreme Court has created an exception that allows an intrusion without reasonable individualized suspicion is markedly different from the school board mandated urinalysis test situation in the present case. In comparison, each of those cases is clearly distinguishable from the present case on one or more of the following grounds: (1) the nature of the intrusion was much less severe; (2) the magnitude of the governmental need for the search was far greater; and/or (3) it was impracticable or impossible to respond to the governmental need with the individualized suspicion requirement. See LaFave, supra, at 2577 (citing and referencing cases).
For example, the premises inspection eases do not involve a serious intrusion upon personal privacy because even the housing inspections, and especially the business inspections, are not “personal in nature.” Camara, 387 U.S. at 537, 87 S.Ct. 1727. “The concern of the inspector is directed toward such facilities as the plumbing, heating, ventilation, gas and electrical systems, and toward the accumulation of garbage and debris, and there is no rummaging through private papers and effects of the householder.” La-Fave, supra, at 2577-78. The search at issue in the present case, by contrast, is extremely personal in nature because it intrudes upon “an excretory function traditionally shielded by great privacy.” Skinner, 489 U.S. at 626, 109 S.Ct. 1402; see also LaFave, supra, at 2577-78 (discussing similar type of search in Acton).
The present case is distinguishable from the “special needs” urinalysis cases, and from other Fourth Amendment cases, in which searches without individualized suspicion were permitted, because those cases involved far greater magnitudes of risks. The searches in those cases were responsive to situations in which “even one undetected instance of wrongdoing could have injurious consequences for a great number of people,” Vernonia, 515 U.S. at 675, 115 S.Ct. 2386 (O’Connor, J., dissenting): as in the case of building inspections, “even a single safety code violation can cause ‘fires and epidemics [that] ravage large urban areas[,]’ ” LaFave, supra, at 2578 (quoting Camara, 387 U.S. at 535, 87 S.Ct. 1727), as in airport screening, “where even a single hijacked plane can result in the destruction of ‘hundreds of human lives and millions of dollars of property,’ ” id. (quoting United State v. Edwards, 498 F.2d 496, 500 (2d Cir.1974)), as in particular comprehensive drug-testing programs, in Skinner for example, “where a single drug-impaired train operator can produce ‘disastrous consequences’ including ‘great human loss’ ” and property loss, id. (quoting Skinner, 489 U.S. at 628, 109 S.Ct. 1402), “in Von Raab, where a customs official using drugs can cause the noninterdiction of a ‘sizable’ drug shipment and consequently injury to the lives of many, and perhaps a breach of ‘national security,’ ” id. (quoting Von Raab, 489 U.S. *568 at 670, 674, 109 S.Ct. 1384), and in Vemonia in which the subjects of the drug-testing program were children who had been committed to the temporary custody of the state as schoolmaster, who were subject to a greater degree of supervision and control than the state may exercise over free adults, and who had a lesser privacy expectation with regard to medical examinations and procedures than the general population, Vernonia, 515 U.S. 646, 115 S.Ct. 2386.
Most important, the cases permitting a search without individualized suspicion “upheld the suspicionless search only after first recognizing the Fourth Amendment’s longstanding preference for a suspicion-based regime, and then pointing to sound reasons why such a regime would be ineffectual under the unusual circumstances- presented.” Vernonia, 515 U.S. at 674, 115 S.Ct. 2386 (O’Connor, J., dissenting); see also id. at 674-75, 115 S.Ct. 2386 (O’Connor, J., dissenting) (discussing cases); LaFave, supra, at 2578-79 (same). For example, the Court in Camara emphasized that an individualized suspicion test was impracticable for searches of homes for safety violations because evidence of code violations ordinarily was not observable from outside of the house, Camara, 387 U.S. at 537, 87 S.Ct. 172.7, while in Bell v. Wolfish, 441 U.S. 520, 560 n. 40, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Court allowed suspicionless searches of prisoners following contact visits because the degree of scrutiny necessary to obtain individualized suspicion would cause “obvious disruption of the confidentiality and intimacy that these visits are intended to afford.” Similarly, a requirement of individualized suspicion for testing train operators after an accident was not feasible in Skinner because “the scene of a serious rail accident is chaotic.” Skinner, 489 U.S. at 631, 109 S.Ct. 1402. In Von Raab, requiring suspicion for testing customs officials was unworkable because it was “not feasible to subject [such] employees and their work product to the kind of day-to-day scrutiny that is the norm in more traditional office environments.” Von Raab, 489 U.S. at 674, 109 S.Ct. 1384. Finally, the Supreme Court’s cases on border and airport searches may be distinguished because in those instances “authorities find themselves in essentially a now-or-never situation as to a large volume of travelers who could not feasibly have been subjected to prior scrutiny.” LaFave, supra, at 2579; see United States v. Ramsey, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); United States v. Moreno, 475 F.2d 44 (5th Cir.1973).
By contrast, there is no comparable justification or precedent for allowing the school board officials in the present case to order a janitor to submit to drug tests without individualized suspicion. Aubrey, whose job title was “custodian”. but whose duties are more aptly described as “janitorial,” was susceptible to close supervision and/or observation by a custodian supervisor, a principal, a vice principal, school teachers, and other school workers. There was no evidence that Aubrey’s job involved more hazardous cleaning materials or equipment than that used by innumerable other ordinary janitorial workers. I have been unable to find any support in the record for the majority’s assertion that Aubrey “constantly was in the presence of young students,” which incorrectly implies that Aubrey’s job was somehow distinguishable from that of an ordinary school janitor. Plainly, there has been no showing that the reasonable individualized suspicion test would likely be ineffectual under the circumstances of Aubrey’s janitorial employment.
The Supreme Court in Chandler, its most recent urinalysis drug test case, reaffirmed that “the Fourth Amendment requires government to respect ‘[t]he right of people to be secure in their persons ... against unreasonable searches and seizures,’ ” Chandler, 520 U.S. at ——, 117 S.Ct. at 1298, and that “[t]o be reasonable under the Fourth Anendment, a search ordinarily must be based on individualized suspicion of wrongdoing,” id. 117 S.Ct. at 1301 (citing Vernonia, 515 U.S. at 670, 115 S.Ct. 2386). However, “ ‘[i]n limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a-search may be reasonable despite the absence of such suspicion.’ ” Id. 117 S.Ct. at 1301 (quoting Skinner, 489 *569 U.S. at 624, 109 S.Ct. 1402); see also Von Raab, 489 U.S. at 665-66, 109 S.Ct. 1384.
The Court clearly indicated that Skinne-rand Von Raab must be read in their unique contexts. “Skinner concerned Federal Railroad Administration (FRA) regulations that required blood and urine tests of rail employees involved in train accidents.” Id. “The FRA adopted the drug-testing program in response to evidence of drug and alcohol abuse by some railroad employees, the obvious safety hazards posed by such abuse, and the documented link between drug- and alcohol-impaired employees and the incidence of train accidents.” Id. Factors tending to offset the privacy concerns were that the regulations reduced intrusiveness; the fact that the industry was regulated pervasively for safety diminished privacy expectations; the surpassing safety risks and interests; the illegal drug and alcohol use by rail employees could “cause great human loss before any signs of impairment become noticeable to supervisors”; the program helped obtain “invaluable information” about major train wreck causes and; an individualized suspicion requirement in the chaotic aftermath of a train accident would impede detection of causation. Id.
In Von Raab, drug interdiction had become the Customs Service’s primary enforcement mission; the covered posts directly involved drug interdiction or otherwise required Customs officers to carry firearms; the employees had access to vast sources of contraband; officers had been targets and some had succumbed to bribery; and it was not feasible to subject Customs Service employees to the kind of day to day scrutiny that is the norm in more traditional work environments. Chandler, 117 S.Ct. at 1301-02.
In Chandler the Supreme Court also pointed out the set of unique circumstances in Vemonia, under which it had sustained a random sample drug-testing program for high school students engaged in interscholastic athletics, with written consent of each athlete’s parents, during the season of each sport: public school systems bear large responsibilities as “guardian and tutor” of children entrusted to their care, there was “an immediate crisis’ caused by a sharp increase in drug use in the school district,” student athletes were “ ‘leaders of the drug culture,’ ” “students within the school environment have a lesser expectation of privacy than members of the population generally,” and it is important to deter drug use by school children and to reduce the risk of injury caused by drug use among student athletes. Id. (quoting and citing Vernonia, 515 U.S. at 646, 115 S.Ct. 2386).
According to theChandler Court, Skinner, Von Raab and Vemonia establish that the government’s “proffered special need for drug testing must be substantial — important enough to override the individual’s acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment’s normal requirement of individualized suspicion.” Id. 117 S.Ct. at 1303. The Supreme Court in Chandler rejected the state’s invitation to apply a more deferential framework, stating that “[o]ur guides remain Skinner, Von Raab, and Vernonia.” Id. 117 S.Ct. at 1302.
Before Chandler, it was already very clear that the present case does not fit into the Skinner — Von . Raab — Vemonia “Special Needs” category. For the reasons previously discussed, the present case is clearly distinguishable from other cases allowing suspi-cionless searches or seizures in terms of the nature of the intrusion, the magnitude of risks to human lives and property, and/or the practicability of application of the reasonable individualized suspicion test. Chandler confirms, however, that, in the present case, the governmentally proffered special need for suspieionless drug testing has not been demonstrated to be real, substantial or sufficiently vital to suppress “the Fourth Amendment’s normal requirement of individualized suspieion[,]” id. 117 S.Ct. at 1303, when measured by “[o]ur guides ... Skinner, Von Raab, and Vernonia [,]” id. 117 S.Ct. at 1302.
First, the school board in the present case has not established that there was any demonstrated need for the suspicionless drug testing of janitors and other school workers. In Skinner, Von Raab, and Vemonia, the urinalysis tests were administered pursuant to well defined programs established by gov-ernmentally promulgated regulations or writ *570 ten policy statements based on documented needs, not upon the pure ipse dixit of local government officials. In Vemonia, the drug testing was also authorized by the written consent of the parents of each student-athlete, which consent was obtained as a condition precedent to participation in interseho-lastic athletics.
Second, there has been no demonstration in the present case that public safety is genuinely in jeopardy or that there is a critical and immediate need to suppress the Fourth Amendment’s normal requirement of individualized suspicion. Unlike the situation presented in Skinner, the record here indicates that the school board has not undertaken any kind of study, much less a systematic study, of drug abuse by janitors and other school workers. Consequently, the school board had not established a documented link between drug abuse by janitors and other school workers and any school accident or exposure of children to drugs. Further, the record does not reflect that school janitors participate in an industry that is regulated pervasively to ensure safety. There was no indication of a surpassing safety interest in guarding against the risk that janitors would cause loss of large numbers of human lives and millions of dollars of property damage due to drug use before any signs of impairment would become noticeable to supervisors. There was no evidence that the individualized suspicion requirement for a drug test of janitors would seriously impede the employer’s ability to identify and eliminate or rehabilitate drug-impaired janitors.
The present case, involving a school janitor, in contrast with Von Raab, does not involve a Customs law enforcement officer who is directly involved in drug interdiction, required to carry firearms, given access to vast sources of contraband, exposed to the risk of bribery and blackmail by illegal drug traffickers, capable of facilitating importation of sizable drug shipments or blocking the apprehension of dangerous criminals, and engaged in a mission that is not susceptible to day-to-day scrutiny and supervision as in more traditional work environments. See Von Raab, 489 U.S. at 670-674, 109 S.Ct. 1384.
Finally, the present case, which is quite distinguishable from Vemonia, involves a free adult janitorial worker employed in the mundane job of maintaining school buildings and grounds, not high school and junior high school student athletes, who as students within the school environment have a lesser expectation of privacy than members of the population generally, and to whom the public school system owes a duty, as guardian and tutor of children entrusted to its care, to protect from moral corruption and physical injury due to drug use, especially during an immediate crisis caused by a sharp increase in drug use in the school district. See Vernonia, 515 U.S. at 654-664, 115 S.Ct. 2386.
In sum, the record in the present case is notably lacking in the presentation of a concrete danger demanding departure from the Fourth Anendment’s main rule that, to be reasonable under the Fourth Anendment, a search must be based on individualized suspicion. See Chandler, 117 S.Ct. at 1303.
Moreover, the majority’s decision conflicts with United Teachers v. Orleans and Jefferson Parish School Boards, 142 F.3d 853 (5th Cir.1998), in which this court held unconstitutional, under Chandler’s (Skinner — Von Raab — Vemonia based) “special needs” analysis, similar programs for the suspicionless urinalysis testing of school board employees. The rules of two parish school boards required employees injured in the course of employment to submit to urine tests. The rules were not based upon any identified problem of drug use by teachers or their teachers’ aids or clerical workers. This court concluded that the school boards had failed to show “[any] legal justification for insisting upon drug tésting urine without a showing of individualized suspicion of wrongdoing in a given case, certainly nothing beyond the ordinary needs of law enforcement.” Id. at 857. The court explained:
Special needs are just that, special, an exception to the command of the Fourth Amendment. It cannot be the case that a state’s preference for means of detection is enough to waive off the protections of privacy afforded by insisting upon individualized suspicion. It is true that the principles we apply are not absolute in their *571 restraint of government, but it is equally true that they do not kneel to the convenience of government, or allow their teaching to be so lightly slipped past. Surely then it is self-evident that we cannot rest upon the rhetoric of the drug wars. As destructive as drugs are and as precious are the charges of our teachers, special needs must rest on demonstrated realities. Failure to do so leaves the effort to justify this testing as responsive to drugs in public schools as a “kind of immolation of privacy and human dignity in symbolic opposition to drug use,” that troubled Justice Scalia in Von Raab.
Id. (quoting Von Raab, 489 U.S. at 681, 109 S.Ct. 1384 (Scalia, J., dissenting)).
The school board in the present case has offered no more special needs or legal justification for insisting upon drug urine testing without a showing of individualized suspicion of wrongdoing in a given case than the school boards did in United Teachers. The testing in the present case does not respond to any identified problem of drug use by janitors or other school workers. Instead, it rests only on the school board’s “preference for means of detection [without] the protections of privacy afforded by insisting upon individualized suspicion” and the “rhetoric of the drug wars,” rather than on the “demonstrated realities,” id., that are required to establish “special needs” for suspicionless urinalysis testing of employees under Chandler, Skinner, Von Raab and Vemonia.